**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| BUTLER AMUSEMENTS, INC., | |
| Plaintiff, | |
| v. | Civil Action No. 24-1042 |
| | Judge Beryl A. Howell |
| UNITED STATES DEPARTMENT OF LABOR, *et al.*, | |
| Defendants. | |

**<u>MEMORANDUM OPINION</u>**

This case stems from an administrative enforcement action over a violation that occurred more than a decade ago.  In 2012, plaintiff Butler Amusements, Inc., sought to bring over two hundred foreign workers to the United States through the H-2B visa program to work at its traveling carnival.  Compl. ¶ 56, ECF No. 1; Certified Administrative Record ("AR") 4078-80, ECF No. 13.  To get immigration approval, plaintiff had to follow the program's comprehensive regulatory scheme—a process requiring employers first to recruit domestically and, only if unsuccessful, to pay H-2B noncitizen workers the local wage to ensure fair compensation to those foreign workers while not depressing wages for U.S. workers.  *See* 8 C.F.R. § 214.2(h)(6)(iii); AR 4076-77.  Plaintiff consequently obtained H-2B approval by representing to the Department of Labor ("DOL") and Department of Homeland Security ("DHS") that the foreign workers would be hired as amusement and recreation attendants, and that no U.S. workers were willing or able to take those jobs.

"But not everything was as [plaintiff] represented." Defs.' Mem. Supp. Cross Mot. for Sum. J. ("Defs.' Opp'n") at 7, ECF No. 19-1. Plaintiff does not dispute this.  A DOL investigation revealed that plaintiff misclassified workers, employing a number of H-2B

1

noncitizen workers in roles other than those approved to obtain the H-2B visas, and paying the noncitizen workers a lower wage than would have been necessary for U.S. workers in the same jobs. AR 4081-83. In response, DOL initiated enforcement proceedings against plaintiff in 2018 for violating the 2008 H-2B regulations ("2008 Rules"). AR 0001. After a hearing, an administrative law judge ("ALJ") ordered plaintiff to pay $26,786 in back wages and $10,000 in civil penalties, AR 3865, which order was affirmed, in 2023, by DOL's Administrative Review Board ("Board"), AR 4075-4112.

After five years of administrative proceedings, plaintiff then sued DOL and its Secretary in her official capacity (collectively "defendants"), raising for the first time in the instant lawsuit claims that enforcement of the terms of the H-2B visa program violated plaintiff's constitutional rights under Article II, Article III, and the Seventh Amendment—turning a run-of-the-mill immigration enforcement action into one of constitutional dimensions. Compl. ¶¶ 88-118. Without explanation for failing to raise these constitutional objections before the agency or disputing the misrepresentations made during the H-2B visa application process, plaintiff asks this Court to strike down DOL's enforcement regime wholesale as unconstitutional.

Short of that remedy, plaintiff, separately, brings two non-constitutional claims rejected by DOL, complaining that, because of the unusual history of the 2008 DOL adjudication rules being applied, it has spent "the last 11 years defending itself" against violations of a "doubly-dead, vacated-and-replaced 2008 DOL Rule," asking that further enforcement of these rules be stopped so that "the same set of regulations apply to all alike." Pl.'s Am. Mot. for Sum. J. ("Pl.'s Mot.") at 1, 29, ECF No. 17.

For the reasons stated below, plaintiff's motion for summary judgment is denied, *see id.* at 1, and defendants' cross-motion for summary judgment is granted, Defs.' Cross-Mot. Sum. J. ("Defs.' XMSJ") at 1, ECF No. 19.

## I.    BACKGROUND

### A.    Statutory Background

The Immigration and Nationality Act of 1952 ("INA") "established the modern framework for regulation of immigration in the United States, including provisions for the admission of permanent and temporary foreign workers." *La. Forestry Ass'n Inc. v. U.S. Dep't of Labor*, 745 F.3d 653, 659 (3d Cir. 2014).  Roughly thirty years later, in 1986, Congress amended the INA "by, among other things, bifurcating the H-2 visa program into the H-2A and H-2B programs, which govern the admission of agricultural and nonagricultural workers, respectively." *Id.*  "H-2B visas are statutorily available for those aliens (1) 'having a residence in a foreign country which [they] ha[ve] no intention of abandoning' and (2) 'who [are] coming temporarily to the United States to perform other [nonagricultural] temporary service or labor,' but only (3) 'if unemployed persons capable of performing such service or labor cannot be found in this country.'" *Outdoor Amusement Bus. Ass'n, Inc. v. Dep't of Homeland Sec.*, 983 F.3d 671, 677 (4th Cir. 2020) (quoting 8 U.S.C. § 1101(a)(15)(H)(ii)(b)).  "Because the program exists at the intersection of labor and immigration law, it is administered jointly by DOL and [DHS]." *Sun Valley Orchards, LLC v. U.S. Dep't of Labor* ("*Sun Valley II*"), ---F.4th---, No. 23-2608, 2025 WL 2112927, at *1 (3d Cir. Jul. 29, 2025).   As such, a prospective employer seeking to employ noncitizen workers for nonagricultural work must follow a two-step application process.

At the first step, a prospective employer must apply for and obtain a temporary labor certification from DOL, certifying that sufficient capable American workers are not available

and that noncitizen employment will not "adversely affect the wages and working conditions of similarly employed United States workers."  8 C.F.R. § 214.2(h)(6)(iii)(A); *see* 20 C.F.R. § 655.20.[1]  To that end, prospective employers must obtain a prevailing wage determination for the specific job from DOL's Employment and Training Administration by submitting ETA Form 9141, *id.* § 655.10, because the employer must offer and pay the H-2B workers the highest of the prevailing wage or the applicable federal, state, or local minimum wage for the described role, *id.* § 655.22(e).  After obtaining the prevailing wage determination for the described job, the employer must advertise and attempt to recruit U.S. workers for the role, *i.e.*, the same job for which it is seeking H-2B temporary workers.  *Id.* §§ 655.15, 655.17.  An employer unable to fill the roles with U.S. workers within a specified time may then submit an Application for Temporary Employment Certification, otherwise known as an ETA Form 9142B, to fill the open roles with H-2B temporary workers and a recruitment report describing the attempt to advertise and recruit U.S. workers for the same job but to no avail.  *Id.* §§ 655.15, 655.17, 655.20.

As part of the ETA Form 9142B application to hire H-2B workers for the job, the employer "must attest as part of" its application "that it will abide by" 17 conditions laid out in 20 C.F.R. § 655.22.  *See id.* § 655.22(a)-(n).  Relevant here, an employer must certify, *inter alia*, that the application accurately states "proper job classification" information by providing the "dates of temporary need, reason for temporary need, and number of positions being requested for labor certification," *id.* § 655.22(n), because "[a] temporary labor certification is valid only for the . . . specific services or labor to be performed," *id.* § 655.34(b).  Finally, the employer

---

[1]    Unless otherwise noted, all references to 20 C.F.R. Part 655, subpart A are to the regulations published on December 19, 2008, which became effective on January 18, 2009.  U.S. Dep't of Labor, Emp't & Training Admin., Labor Certification Process and Enf't for Temp. Emp't in Occupations Other Than Agric. or Registered Nursing in the U.S. (H-2B Workers), & Other Tech. Changes ("2008 Rules"), 73 Fed. Reg. 78020, 78,047, 2008 WL 5262663 (Dec. 19, 2008).

must certify, under penalty of perjury, that the information contained in its application to DOL is true and accurate and that it agrees to abide by the terms and obligations of the H-2B program. *Id.* § 655.65(f); 73 Fed. Reg. 78020, 78035 (Dec. 19, 2008). Upon receipt of an ETA Form 9142B application, DOL may certify the employer, deny the employer, or issue a request for further application. 20 C.F.R. § 655.23. In short, an employer, who seeks a prevailing wage determination for a job described, for example, as a maintenance shop custodian, submits a recruitment report showing the effort to advertise and recruit U.S. workers for that position was to no avail, and files an ETA Form 9142B application for a noncitizen worker to serve in that position but, instead, after receiving its certification, employs the H-2B workers as semi-truck drivers, has misrepresented its intentions and violated the terms and conditions of the H-2B visa program.

After DOL certifies the employer, the second step of the application process to employ noncitizen workers for nonagricultural work may proceed with the employer submitting a Form I-129 to DHS for temporary admission of H-2B workers. 20 C.F.R. § 655.1(b); 8 C.F.R. § 214.2(h)(6)(iv)(A); *see also Outdoor Amusement*, 983 F.3d at 676 ("Under the 2008 Rules, . . . Homeland Security would not consider granting an H-2B petition if Labor denied the employer a labor certification."). Like the ETA Form 9142B application, the Form I-129 requires the employer applicant to provide job classifications and attest under penalty of perjury that the information provided is true and accurate. 8 C.F.R. § 214.2(h); AR 0365. "Although the DOL's labor certification is a prerequisite to obtaining an H-2B visa petition, the authority to grant or deny an H-2B visa petition ultimately rests with the DHS alone." *La. Forestry*, 745 F.3d at 661 (citing 8 U.S.C. § 1184(c)).

Effective in 2009, DHS delegated its investigative and enforcement authority over the H-2B program, including the authority to impose administrative remedies, to DOL "to enforce compliance with the conditions of a [Form I-129] petition and [DOL-approved] temporary labor certification to admit or otherwise provide status to an H-2B worker."  C.F.R. 214.2(h)(6)(ix); *see also* 8 U.S.C. § 1184(c)(14)(A) (granting authority to DHS to impose administrative remedies when the Secretary of DHS finds "a substantial failure to meet any of the conditions of the petition to admit or otherwise provide status to a nonimmigrant worker under [8 U.S.C. § 1101(a)(l5)(H)(ii)(b)] or . . . a willful misrepresentation of a material fact in such petition"); *id.* § 1184(c)(14)(B) (granting authority to DHS to delegate enforcement authority to Secretary of Labor).  DOL, in turn, delegated this authority to its Wage and Hour Division Administrator ("Administrator").  20 C.F.R. § 655.50(a).

DOL regulations prescribe a detailed H-2B enforcement regime, beginning with an investigation to ensure compliance with the program.  *See generally id.* § 655.50.  After an investigation, the Administrator determines whether a violation of the H-2B program has occurred, including whether the employer willfully misrepresented a material fact in its application materials or substantially failed to meet the applicable conditions.  8 U.S.C. § 1184(c)(14)(A); 20 C.F.R. § 655.60.  If such a finding is made, the Administrator may "impose such administrative remedies (including civil monetary penalties in an amount not to exceed $10,000 per violation)" as "determine[d] to be appropriate." 8 U.S.C. § 1184(c)(14)(A)(i).  These other "administrative remedies" may include back wages.  20 C.F.R. § 655.65(i).

At the conclusion of an investigation, the Administrator institutes administrative proceedings for any willful misrepresentations or substantial failures to comply with the conditions by issuing a written determination letter to the employer explaining the findings as

well as the sanctions and remedies sought.  29 C.F.R. §§ 503.41-.42.  Any employer "desiring

review of" the Administrator's determination, "including judicial review," must "make a request

for [] an administrative hearing in writing" within 30 days.  *Id.* § 503.43(a).  An ALJ is then

assigned to the case, with ensuing adversarial litigation.  *Id.* § 503.48(a).  DOL regulations

specify that "[t]he Federal Rules of Civil Procedure . . . apply in any situation not provided for,"

*id.* § 18.10(a); *see also id.* § 503.44(a), and authorize the parties to seek dismissal, *id.* § 18.70(c),

take discovery, *id.* § 18.50-65, seek the equivalent of summary judgment, *id.* § 18.72(a), and

engage in the equivalent of a bench trial where the parties may present evidence, including

testimony, to the ALJ, *id.* § 18.80-.82; after which the ALJ "must issue a written decision and

order," *id.* § 18.92.  The parties may appeal an ALJ's decision to DOL's Administrative Review

Board.  *Id.* § 503.51(a).

### B.    Factual Background

Plaintiff operates a traveling carnival, providing rides, games, and concessions to fairs in

California, Oregon, Washington, Idaho, Arizona, and Nevada.  AR 4078; Compl. ¶ 10.  In

October 2012, plaintiff began the process to employ H-2B workers by posting a job

advertisement to recruit U.S. workers for "Carnival and Amusement and Recreation Attendants,"

which job covered a "variety of attending duties" at amusement facilities, including "[s]et[ting]

up, tear[ing] down, [and] operat[ing] amusement rides, food concessions and/or games."  AR

3791.  Plaintiff then applied to DOL for an H-2B temporary labor certification covering 246

workers to be employed as "Amusement and Recreation Attendants."  AR 3791, 4078-80.  In

line with the recruitment advertisement, under "Job duties" on the ETA Form 9142B, plaintiff

represented that the H-2B workers would "[p]erform [a] variety of attending duties" for the

traveling carnival, including "[s]et up, tear down, operate amusement rides, food concessions

and/or games."  AR 4079-80.  Plaintiff noted that the prevailing practices in the traveling

7

amusement industry would be followed for "housing, transportation and weekly salary for workers," such that plaintiff would make "available mobile housing valued at $125.00 per week," and would provide "transportation from venue to venue, and scheduled transportation to laundry[] [and] shopping valued at $25.00 per week."  AR 4079-80.  As part of its application, plaintiff attested, under penalty of perjury, that it would comply with the requirements of the H-2B program, and that the application accurately described the job opportunity.  AR 4080.

Based on plaintiff's representations, DOL approved plaintiff's application on December 14, 2012.  AR 3793.  Plaintiff then petitioned DHS for H-2B visas for 246 temporary workers on December 17, 2012, by filing a Form I-129 describing the "job title" of the prospective employees as "Amusement and Recreation Assistants," and received approval from DHS on January 13, 2013.  AR 103, 3793.  The temporary workers arrived in early February 2013.  AR 4080-81.

Shortly thereafter, the Administrator opened an investigation for the period from February 1, 2013, to April 24, 2013.  As part of the investigation, an investigator visited plaintiff's work site in Santa Barbara, California, on April 23 and 24, 2013, and observed plaintiff's operations and interviewed employees.  AR 3794.  Despite plaintiff's attestations in obtaining the H-2B visas, the investigator found that nine H2-B workers did not perform the job duties of amusement and recreation attendants, but instead worked as drivers, maintenance workers, and supervisors. AR 4081-83.  For those workers, plaintiff paid more than the prevailing wage for amusement and recreation attendants but less than the prevailing wage for the jobs the noncitizen workers performed.  AR 4083.

After the investigation, the Administrator issued a February 6, 2018, determination letter explaining that plaintiff violated the 2008 H-2B regulations, also referred to as the "2008 Rules,"

by substantially failing to comply with the proper-job-classification requirement in violation of 20 C.F.R. § 655.22(n) and part 5, question 1 of the Form I-129.  AR 0001, 4085; *see also* AR 3801 ("On February 6, 2018, the Administrator issued the Determination Letter finding that [plaintiff] substantially failed to comply with the requirement to provide proper job classification information on the Form 9142 and DHS Form I-129.").  The determination letter further advised that the Administrator determined Butler owed $24,987.20 in unpaid wages and $10,000 in civil penalties.  AR 0001-02.

### C.    Procedural History

Plaintiff timely requested an ALJ hearing after receiving the determination letter.  AR 4085; Compl ¶ 62.  At the outset, the ALJ denied plaintiff's request for a summary decision and rejected plaintiff's argument that the 2008 H-2B regulations were unenforceable and the Administrator's enforcement action was barred by the statute of limitations.  *See* AR 0355-74.  Following pre-trial discovery, the ALJ held a hearing in May 2019, involving telephonic and live testimony from multiple witnesses.  AR 4086; Compl. ¶ 64.  Over a year later, on September 30, 2020, the ALJ issued a decision, finding that plaintiff "substantially failed to comply with the H-2B program" by employing nine H-2B workers outside the job duties of amusement and recreation attendants despite attestations plaintiff made in its ETA Form 9142B, in violation of 20 C.F.R. § 655.22(n).  AR 3789-3822.[2]  After correcting a miscalculation, the ALJ ordered plaintiff to pay $26,786 in back wages and affirmed the Administrator's decision for $10,000 in civil penalties.  AR 4086.  In doing so, the ALJ concluded that plaintiff failed to demonstrate any

---

[2]    Despite the Administrator's initial charge that plaintiff violated both ETA Form 9142B and Form I-129, the ALJ's ruling did not address the alleged violation of Form-129 for reasons unclear from the administrative record. In any event, the record is clear that the ALJ and the Administrative Review Board found plaintiff to have violated the terms of its ETA Form 9142B by certifying that it would abide by the proper job classification requirement imposed by 20 C.F.R. § 655.22(n)—which was a necessary condition for DHS to have approved its subsequent Form I-129 to bring noncitizens into the U.S. to work under the certified job role.  *See* AR 3789-3822; 4075-4112.

entitlement to certain credits to lower the amount of back wages owed.  AR 4086.  Plaintiff

appealed the ALJ decision to the Review Board, which issued its own decision affirming the

ALJ, on July 28, 2023.  AR 4075-4112.

Plaintiff timely instituted the instant action, on April 11, 2024, against DOL and Julie Su,

in her official capacity as the Secretary of the DOL, challenging the Review Board's decision on

various grounds.  *See* Compl. ¶¶ 88-132, ECF No. 1. Specifically, plaintiff claims that the

enforcement action violated its constitutional rights under Article II, Article III, and the Seventh

Amendment, and also that the 2008 Rules, with which plaintiff is charged with violating, are

unenforceable, and the adjudication violated the Administrative Procedure Act ("APA").  Compl.

¶¶ 88-132.  The parties have briefed cross-motions for summary judgment, which are now ripe

for resolution.  *See* Pl.'s Mot.; Defs.' XMSJ.

## II.    LEGAL STANDARD

The APA authorizes judicial review of any "final agency action for which there is no

other adequate remedy in a court," 5 U.S.C. § 704, and "instructs a reviewing court to set aside

agency action found to be 'arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law,'" *Cigar Ass'n of Am. v. FDA*, 964 F.3d 56, 61 (D.C. Cir. 2020) (quoting 5

U.S.C. § 706(2)(A)).  This standard "'requires agencies to engage in reasoned decisionmaking,'

and . . . to reasonably explain to reviewing courts the bases for the actions they take and the

conclusions they reach." *Bhd. of Locomotive Eng'rs & Trainmen v. Fed. R.R. Admin.*, 972 F.3d

83, 115 (D.C. Cir. 2020) (internal citations omitted) (quoting *Dep't of Homeland Sec. v. Regents

of the Univ. of Cal.* ("*Regents*"), 591 U.S. 1, 16 (2020)).  While "judicial review of agency action

is limited to 'the grounds that the agency invoked when it took the action,'" *Regents*, 591 U.S. at

20 (quoting *Michigan v. EPA*, 576 U.S. 743, 758 (2015)), the agency, too, "must defend its actions based on the reasons it gave when it acted," *id.* at 24.

In APA cases such as this one, involving cross-motions for summary judgment, "the district judge sits as an appellate tribunal," *Rempfer v. Sharfstein*, 583 F.3d 860, 865 (D.C. Cir. 2009) (quoting *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001)), since the "'entire case on review is a question of law,' and the 'complaint, properly read, actually presents no factual allegations, but rather only arguments about the legal conclusion to be drawn about the agency action,'" *id.* (quoting *Marshall Cnty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993)).

## III.    DISCUSSION

Despite never raising the argument through five years of litigation before DOL, plaintiff now alleges that DOL's administrative adjudication of its H-2B violations ran afoul of the U.S. Constitution, in violation of Article II (Count 3), Article III (Count 1), and the Seventh Amendment (Count 2).  Compl. ¶¶ 88-118; Pl.'s Mot. at 38-43.  Plaintiff further claims that the 2008 Rule is unenforceable (Counts 4-6), the administrative action was untimely (Count 7), and the agency acted arbitrarily and capriciously in denying any offset to plaintiff's owed back wages with various credits (Count 7).  Compl. ¶¶ 119-32; Pl.'s Mot. at 17-38.  Defendants dispute each contention.  Defs.' Opp'n at 9-30.  Each of plaintiff's challenges to the administrative proceedings and determinations are addressed below and rejected.

### A.    Plaintiff's Article III and Seventh Amendment Challenges Fail.

Article III of the Constitution vests "[t]he judicial Power of the United States . . . in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish."  U.S. Const. art. 3, § 1.  The Seventh Amendment, in turn, provides that "[i]n suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by

jury shall be preserved." U.S. Const. amend. VII. Relying on *SEC v. Jarkesy*, 603 U.S. 109

(2024), plaintiff argues that defendants violated these constitutional provisions because any

enforcement action against it should have been brought "in an Article III court," and not an

administrative tribunal, so that the case could have been submitted to a jury, as guaranteed by the

Seventh Amendment. Pl.'s Mot. at 38.[3] Defendants argue, however, that "even if the Seventh

Amendment is implicated, this case plainly involves public rights," which "can be adjudicated

outside federal courts" unlike "private rights." Defs.' Opp'n at 15-16 (citing *Oil States Energy*

*Services, LLC v. Greene's Energy Group, LLC*, 584 U.S. 325, 334 (2018)). Defendants are

correct.

　　To determine whether an underlying claim can be adjudicated in a "jury-less

administrative forum," a "two-part analysis" is applied. *Axalta Coating Sys. LLC v. Fed.*

*Aviation Admin.*, 144 F.4th 467, 473 (3d Cir. 2025). First, the court must determine "whether

th[e] 'action implicates the Seventh Amendment' because of its common law ancestry or the

common-law nature of the remedy sought." *Id.* (quoting *Jarkesy*, 603 U.S. at 120). Even if the

action does so, at the second step, a court must "consider whether the 'public rights' exception"

applies. *Id.* (quoting *Jarkesy*, 603 U.S. at 120). Public rights, as opposed to private rights, are

those that "historically could have been determined exclusively by [the executive and legislative]

---

[3]　　In separate claims, plaintiff challenges the administrative adjudication as inconsistent with both Article
III's vesting clause and the Seventh Amendment's jury trial right for common law claims, but the same arguments
are presented as to both. Pl.'s Mot. at 38-41. Indeed, the "Supreme Court has long recognized the close relationship
between Article III and the Seventh Amendment" and has "confirm[ed] their analytical similarity," *Sun Valley*,
2025 WL 2112927, at *4 n.3 (first citing *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 53-54 (1989); and then
citing *Jarkesy*, 603 U.S. at 134), and thus courts generally evaluate the claims simultaneously, *see, e.g.*, *AT&T Inc.
v. FCC*, 135 F.4th 230, 232, 235-242 (5th Cir. 2025); *Axalta Coating Sys. LLC v. Fed. Aviation Admin.*, 144 F.4th
467, 477 n.3 (3d Cir. 2025) (noting that plaintiff challenged the administrative action under both Article III and the
Seventh Amendment but, "because matters involving public rights may be assigned to the executive branch for
adjudication without offense to Article III, our conclusion that the FAA's enforcement action is within the scope of
the public rights doctrine necessarily resolves [plaintiff's] argument that the adjudication violated Article III"). That
practice is adopted here given the parties briefing, which did not distinguish between the two claims. *See* Pl.'s Mot.
at 38-41; Defs.' Opp'n at 15-20.

branches." *Jarkesy*, 603 U.S. at 128 (quoting *Stern v. Marshall*, 564 U.S. 462, 493 (2011) (alteration in original)).  In other words, public rights matters are those "that can be pursued only by grace of the other branches."  *Stern*, 564 U.S. at 493 (citing *Murray's Lessee v. Hoboken Land & Imp. Co.*, 59 U.S. (18 How.) 272, 284 (1955)).  On the other hand, "[i]f a suit is in the nature of an action at common law," because the claim "is made of 'the stuff of the traditional actions at common law tried by the courts at Westminster in 1789,'" "then the matter presumptively concerns private rights."  *Jarkesy*, 603 U.S. at 127-28 (quoting *Stern*, 564 U.S. at 484).  The Supreme Court has acknowledged a mess of its own making in this area given the "arcane distinction[] and confusing precedents" on delineating public and private rights cases. *Id.* at 130 (quoting *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 583 (1985)); *see id.* ("The Court has not definitively explained the distinction between public and private rights, and we do not claim to do so today." (internal quotation marks omitted)).  Nevertheless, the Supreme Court has made clear that certain "historic categories of adjudications fall within the exception," including "immigration," "relations with Indian tribes, the administration of public lands, and the granting of public benefits such as payments to veterans, pensions, and patent rights."  *Id.* at 129-30; *see also AT&T*, 135 F.4th at 238 ("Examples [of public rights cases] include revenue collection, foreign commerce, immigration, tariffs, tribal relations, public lands, public benefits, and patents.").  In such cases, "Congress can reserve to itself the power to decide, delegate that power to executive officers, or commit it to judicial tribunals."  *Oil States*, 584 U.S. at 342.  As long as "Congress properly assigns a [public rights] matter to adjudication in a non-Article III tribunal, the Seventh Amendment poses no independent bar to the adjudication of that action by a nonjury factfinder."  *Id.* at 345 (internal quotation marks omitted).

Here, though agreeing that the action implicates the Seventh Amendment, Pl.'s Mot. at 38-39; Defs.' Opp'n at 15-16, the parties dispute whether the action involves adjudicating private or public rights.  Defendants submit that "[w]hatever else public-rights cases might include, they unquestionably include Congress's 'plenary power over immigration'" because "[t]he United States 'has broad, undoubted power over the subject of immigration and the status of [noncitizens],' derived from both the Constitution and 'its inherent power as sovereign to control and conduct relations with foreign nations.'"  Defs.' Opp'n at 16 (first quoting *Jarkesy*, 602 U.S. at 129; and then quoting *Arizona v. United States*, 567 U.S. 387, 394 (2012)).  Plaintiff counters that the executive's determination of immigration status "does not identify any historical practice to support a sweeping immigration-related public rights exception."  Pl.'s Reply Supp. MSJ ("Pl.'s Reply") at 8, ECF No. 22.  Plaintiff is mistaken.

Congress's "power over immigration" is "plenary."  *Jarkesy*, 603 U.S. at 129.  Almost a century ago the Supreme Court noted that "[u]nder the Constitution and laws of the United States, control of the admission of [noncitizens] is committed exclusively to Congress, and, in the exercise of that control, it may lawfully impose appropriate obligations, sanction their enforcement by reasonable money penalties, and invest in administrative officials the power to impose and enforce them."  *Lloyd Sabaudo Societa Anonima Per Azioni v. Elting*, 287 U.S. 329, 334 (1932).  Thus, Congress may authorize the Executive branch to administer, and adjudicate, immigration laws like the voluntary H-2B program permitting U.S. employers to employ noncitizens, subject to certain conditions and obligations.  *See Oceanic Steam Nav. Co. v. Stranahan*, 214 U.S. 320, 344-45 (1909) ("Congress has the power to exclude aliens from the United States," to "prescribe the terms and conditions on which they may come in," and to "commit the enforcement of such conditions and regulations to executive officers" without a

jury.).   Put another way, "the federal government need not allow employers to hire foreign workers *at all*."  Defs.' Opp'n at 17 (emphasis in original).  The H-2B visa program is a benefit made available to employers only "by grace of the other branches."  *Stern*, 564 U.S. at 493.

The balancing of immigration rules with adequate protection for American workers is reflected clearly in the temporary foreign worker program, codified as part of the INA of 1952, and then refined in the Immigration Reform and Control Act of 1986 to "close the back door on illegal immigration so that the front door on legal immigration may remain open."  *Noriega-Perez v. United States*, 179 F.3d 1166, 1170 (9th Cir. 1999) (quoting H.R. Rep. No. 99-682, pt. 1, at 46 (1986)).  Congress determined that "[e]mployment is the magnet that attracts [noncitizens] here illegally," and prohibited employers from knowingly hiring "an unauthorized [noncitizen] to work in the United States," *id.* (citing 8 U.S.C. § 1324a), except as authorized in the H-2B visa program allowing "U.S. employers to recruit and hire temporary unskilled, non-agricultural workers from abroad to fill positions that no qualified U.S. worker will accept," *La. Forestry*, 745 F.3d at 659 (citing 8 U.S.C. § 1101(a)(15)(H)(ii)(b)).  DOL's regulations prescribing how an employer may recruit and hire noncitizen workers under the H-2B program are thus properly categorized as "new statutory obligations," *Atlas Roofing Co. v. Occ. Safety & Health Review Comm'n*, 430 U.S. 442, 450 (1977), and violations thereof "derive[] from a federal regulatory scheme," *Stern*, 564 U.S. at 490,  with "standards [that] bring no common law soil with them," *Jarkesy*, 6003 U.S. at 137, since those rules were created pursuant to Congress's plenary power over immigration.  *See also Dep't of State v. Muñoz*, 602 U.S. 899, 911-12 (2024) ("[T]he through line of history is recognition of the Government's sovereign authority to set the terms governing the admission and exclusion of noncitizens.").  Accordingly, with the H-2B visa program, "Congress has" properly "entrusted to an administrative agency the task [of]

adjudicating violations of the customs and immigration laws and assessing penalties based thereon." *Atlas Roofing*, 430 U.S. at 451; *see also Frank's Nursery, LLC v. Walsh*, No. 21-cv-3485, 2022 WL 2757373, at *8 (S.D. Tex. Jul. 14, 2022) (holding the same with respect to the H-2A visa program for temporary agricultural workers).

Until recently, federal courts have uniformly found that adjudications of violations of the H-2 visa program in agency tribunals did not run afoul of Article III or the Seventh Amendment. *See, e.g., Frank's Nursery*, 2022 WL 2757373, at *8 (holding that agency adjudication of H-2A visa program violations comported with the Constitution); *Sun Valley Orchards, LLC v. U.S. Dep't of Labor*, No. 21-cv-16625, 2023 WL 4784204, at *5-6 (D. N.J. Jul. 27, 2023) (same), *rev'd*, *Sun Valley II*, 2025 WL 2112927.  The Third Circuit has recently broken a different path.

In *Sun Valley II*, the Third Circuit determined that an employer's violations of the H-2A visa program, which permits employers to hire temporary workers for agricultural work after showing an inability to recruit U.S. workers for the positions, should have been heard in an Article III court, reversing the district court's contrary holding.  2025 WL 2112927, at *8.  In that case, a plaintiff had circulated a "job order" to domestic and foreign workers advertising certain work conditions, such as "no-cost housing" and "access to a kitchen."  *Id.* at *1-2.  The H-2A regulations provide that such a "job order functions as a work contract . . . and DOL may enforce its terms."  *Id.* at *1 (citing 20 C.F.R. § 655.122(q)).  A DOL investigation found that the plaintiff did not "keep [the] promises" made in its work contract, a finding affirmed both by an ALJ in a "lengthy written opinion," and by the Administrative Review Board.  *Id.* at *2-3.  The Third Circuit held that, though the H-2A labor certification rules governing the work contract "may ultimately serve immigration-related goals," the dispute "appear[ed]" to be a "common law contract action."  *Id.* at *5-6.  Therefore, in its view, because "[t]he enforcement action in [the]

16

case, . . . resemble[d] [a] common law breach of contract," *id.* at *5 n.4, DOL should have brought its case "before a federal district court," *id.* at *8.

The reasoning of the Third Circuit is neither binding nor persuasive on the facts of the instant case for at least four reasons. First, the facts in *Sun Valley II* are distinguishable. There, the dispute concerned an employer's veracity to its noncitizen employees about their working conditions. Thus, in the Third Circuit's view, the dispute stemmed from a "violation of the terms of [a] work contract." *Id.* at *5. Indeed, the Third Circuit noted, the ALJ's analysis "sounded partially in contract" by, for example, finding that the employer "breached a material term of the job order" when it failed to provide employees with kitchen access. *Id.* In contrast, the issue here arises not from plaintiff's representations to its employees as to working conditions, but rather from plaintiff's representations to DOL and DHS over its eligibility for the H-2B visa program. Put differently, the question is not whether an employer fulfilled promises made to its foreign workers, as in *Sun Valley II*, but whether the employer was qualified to bring foreign workers into the U.S. *at all*. *See, e.g.*, AR 4099 (concluding that "Butler Amusements showed reckless disregard for complying with the statute and regulations" when it "employed some of its certified H-2B workers exclusively in occupations outside of the certification"). As even the Third Circuit recognized, "Congress may 'prohibit immigration by certain classes of persons and enforce those prohibitions with administrative penalties assessed without' an independent judge or jury." *Sun Valley II*, 2025 WL 2112927, at *6 (quoting *Jarkesy*, 603 U.S. at 129).

Second, assuming *arguendo* that plaintiff's misrepresentations in the labor certification are contractual in nature, as the "job order" was in *Sun Valley II*—and notwithstanding plaintiff's failure to make such an argument—the labor certification would still not qualify as a common law-like contract subject to the Seventh Amendment. This is because the H-2B visa program is

deeply rooted in a long history of immigration laws governing the admission and exclusion of noncitizens to the U.S. work force, which is the province of public rights.  *See* Charles C. Mathes, *The H-2B Temporary Worker Program*, 80 Fordham L. Rev. 1801, 1806-08 (2012) (detailing the roots of the H-2B visa program to 1917 despite its formal codification in the Immigration Reform and Control Act).  Indeed, to help curb unauthorized immigration, the H-2 program "permitt[ed] employers to utilize temporary foreign workers" subject to certain conditions such as those described above.  *Id.* at 1807; *see also* H.R. Rep. No. 99-682, pt. 1, at 50-51.  This regime ensures that an adequate supply of labor for U.S. employers exists by permitting lawful employment of noncitizens and simultaneously protects jobs of U.S. employees.  Mathes, *H-2B Temporary Worker Program*, at 1813; *see* H.R. Rep. No. 99-682, pt. 1, at 50 ("The essential objective of the program, which the bill does not change, is to permit employers to utilize temporary foreign workers if domestic workers cannot be found and if it can be shown that the use of such foreign labor would not adversely affect the wages and working conditions of domestic workers similarly employed.").

Third, applying the Third Circuit's reasoning here would short circuit the animating rationale of the H-2 visa program—properly certifying labor needs so that DHS may evaluate whether to admit noncitizen temporary workers for specified jobs into the United States.  In other words, the question of whether this is a "breach of contract" or an unauthorized admission of noncitizen workers is merely two sides of the same coin.  Here, plaintiff's temporary certification alone is not the basis for the regulatory violations alleged.  Instead, plaintiff attested to the DOL that it would abide by certain obligations imposed by regulations, which, in turn, was a necessary condition for DHS to permit noncitizens to be admitted to the U.S. temporarily.  Once those noncitizen workers entered the U.S. to work for plaintiff, they were placed in jobs that had not

been properly approved by DOL, and subsequently, DHS.  Failing to abide by the obligations imposed by a regulatory regime Congress created to admit noncitizens for particular purposes, then, undercuts congressional authority to "prohibit immigration by certain classes of persons," which prohibitions the Supreme Court has expressly stated may be enforced "with administrative penalties assessed without a jury."  *Jarkesy*, 603 U.S. at 129.

Finally, even if the adjudication should have been held in an Article III court, defendants contend that plaintiff consented to such non-Article III adjudication by actively participating in proceedings before DOL tribunals without objection.  Defs.' Opp'n at 20-22.  This argument is persuasive notwithstanding that the Third Circuit in *Sun Valley II* rejected the agency's same argument made there.  2025 WL 2112927, at *6-8.  "The entitlement to an Article III adjudicator is 'a personal right' and thus ordinarily 'subject to waiver.'"  *Wellness Int'l Net., Ltd.*, 575 U.S. at 678 (citation modified).  The waiver may be "express or implied."  *Id.* at 685.  A party may impliedly consent to a non-Article III tribunal through its "actions rather than [its] words," including by litigating before a non-Article III tribunal without objection.  *Id.* at 684.  This implied-consent rule "increas[es] judicial efficiency and check[s] gamesmanship," preventing a litigant from "sandbagging" the court by "remaining silent about his objection and belatedly raising the error only if the case does not conclude in [its] favor."  *Id.* at 685; *Stern*, 564 U.S. at 482.

Given that plaintiff litigated for five years before the agency without a peep of concern, plaintiff impliedly "consented to executive adjudication by litigating before the Administrative Law Judge and the Administrative Review Board without objection," *Frank's Nursery*, 2022 WL 2757373, at *8.  To be sure, as observed in *Sun Valley II*, the Supreme Court has required that to find implied or express consent in a non-Article III tribunal, a party must have been "made aware

of the need for consent and the right to refuse it." *Wellness Int'l Network, Ltd. v. Sharif*, 575

U.S. 665, 685 (2015).  Here, as in *Sun Valley II*, plaintiff claims never to have been made aware

of the need for consent to the agency adjudication nor the right to refuse that forum, rendering, in

its view, any argument of waiver meritless.  Pl.'s Reply at 9-10; *Sun Valley II*, 2025 WL

2112927, at *7 (holding that no waiver occurred because "DOL points to no evidence that

[plaintiff] 'was made aware of the need for consent and the right to refuse it").  Plaintiff,

however, was made aware of the need to consent to agency adjudication by choosing to

participate in the voluntary H-2B visa program—a comprehensive statutory and regulatory

immigration program with regulations that provide a detailed enforcement mechanism wherein

violations of the program would be initially adjudicated by a non-Article III decisionmaker and

ultimately subject to an Article III court's review via an appeal of the Administrative Board's

decision.  *See* 20 C.F.R. §§ 655.60-655.76.  Plaintiff also had the right to refuse such

adjudication by either not participating in the voluntary H-2B visa program or participating in the

program and objecting to the agency's adjudication during five years of litigation.  These

considerations went without analysis in the Third Circuit's opinion but are persuasive here.

Thus, even if plaintiff's claim were subject to an Article III decision maker and a jury, plaintiff

impliedly consented to adjudication before the agency.

In sum, defendants properly brought the underlying enforcement action before an agency

tribunal because that action falls within the public rights exception identified in *Jarkesy*.  Further,

even if the public rights exception does not cover the enforcement action, plaintiff impliedly

consented to agency adjudication.  Thus, summary judgment is granted to defendants as to

Counts 1 and 2, and plaintiff's motion is denied.

### B.    Plaintiff's Article II Claim Fails.

Plaintiff next claims, with respect to Count 3, that "vacatur of DOL's entire award" is warranted because "the ALJs enjoy multiple layers of for-cause removal protections," in violation of Article II. Pl.'s Mot. at 42-43; *see also* Compl. ¶¶ 113-18.[4]  Defendants counter that plaintiff failed to exhaust this issue before the administrative agency and also failed to "attempt[] to show any harm" from the removal protections. Defs.' Opp'n at 22-27[5]  Even if this issue were exhausted before the administrative agency, which is not by any means evident, this claim still fails because plaintiff has made *no* argument about suffering *any* harm from the DOL ALJ's removal protections. *See Axalta*, 2025 WL 1934352, at *7 (noting that while the administrative agency did not "defend the constitutionality of the ALJ's removal protections," the plaintiff was "not entitled to relief because it failed to allege or demonstrate that the allegedly unconstitutional removal restriction caused [it] compensable harm").

A plaintiff seeking vacatur of an ALJ's award because of allegedly unconstitutional removal protections must show "that the unconstitutional removal provision *itself* inflicted harm" because "the actions of a lawfully appointed executive officer fulfilling the duties of his office are legitimate and enforceable, even if the President's authority to remove the officer was unconstitutionally limited during his tenure." *K&R Contractors, LLC v. Keene*, 86 F.4th 135, 149 (4th Cir. 2023) (emphasis added); *see also Kaufmann v. Kijakazi*, 32 F.4th 843, 849 (9th Cir. 2022) ("A party challenging an agency's past actions must instead show how the

---

[4]    Despite advancing its removal argument in reliance, in part, on cases involving unconstitutional appointment of executive officers, plaintiff does not challenge the appointment of DOL ALJs. Pl.'s Mot. at 41-43; Pl.'s Reply at 10-13.

[5]    Defendants supported the constitutionality of the ALJ's removal protections in their opening brief, Defs.' Opp'n at 24-27, but three months later in reply, abandoned that position and "no longer defend[] the constitutionality of [the ALJ removal statute] against challenges predicated on multiple layers of removal protections," .' Reply Supp. Cross. Mot. Sum. J. at 12 n.2 (citing Ltr. from Sarah M. Harris, Acting Solicitor Gen. to the Hon. Mike Johnson, Speaker, U.S. House of Rep. (Feb. 20, 2025), https://www.justice.gov/oip/media/1390336/dl?inline.

unconstitutional removal provision *actually harmed* the party." (emphasis in original)).  As the Supreme Court has succinctly stated, "the unlawfulness of the removal provision does not strip the [official] of the power to undertake the other responsibilities of his office."  *Collins v. Yellen*, 594 U.S. 220, 259 n.23 (2021).  As such, "[a]bsent a showing of harm," courts "refuse to unwind the decisions" of administrative decisionmakers based on the alleged unconstitutionality of the ALJ's protections from removal.  *Decker Coal Co. v. Pehringer*, 8 F.4th 1123, 1138 (9th Cir. 2021).[6]  On this issue, courts across the country are unanimous.  *See Avila v. NLRB*, No. 24-cv-1688, 2025 WL 859223, at *7 (D.D.C. Mar. 18, 2025) (collecting authority).

Here, plaintiff's briefing is silent as to any harm stemming from the ALJ's purportedly unconstitutional removal protections, *see generally* Pl.'s Mot., even in reply to defendants' argument identifying this failure to allege harm, *see* Pl.'s Reply at 11 (noting defendants' point that plaintiff "is not entitled to any relief because it cannot show that it was harmed by the violation," but responding only that "[u]nder a severability analysis, *vacatur* is required because there is no reason to think that Congress authorized ALJs to exercise authority over these types of penalties without good cause protection from removal").  Without any showing of harm, a conclusion "that the existence of [removal restrictions] alone tainted the ALJ's decision" is unsupportable.  *Decker Coal*, 8 F.4th at 1137; *see also Axalta*, 2025 WL 1934352, at *7 ("The only harm that [the plaintiff] asserts is the fact of having been made to appear before an ALJ who benefited from allegedly unconstitutional removal protections[,]" which "cannot provide a basis for granting relief to [the plaintiff].").  Accordingly, plaintiff's motion is denied as to Count 3 and defendants' cross-motion is granted.

---

[6]    Distinct from a showing of injury needed to establish standing, this harm requirement is an "element that plaintiffs must show to make out their constitutional claim against . . . removal protections."  *Cortes v. NLRB*, No. 23-cv-2954, 2024 WL 1555877, at *5 (D.D.C. Apr. 10, 2024) (citing *Collins v. U.S. Dep't of Treasury*, 83 F.4th 970, 981 (5th Cir. 2023)).

C.        **The 2008 Rules are Enforceable, and Plaintiff's Statutory Challenges Fail.**

Plaintiff vigorously challenges the long-litigated enforcement action against it based on the belief that the 2008 Rules forming the basis for the charged violation are unenforceable either because of a different court's prior order or because DOL's superseding 2015 Rules, *see infra* Part III.C.3, rendered the 2008 Rules retroactively unenforceable.  *See* Pl.'s Mot. at 17-29; Pl.'s Reply at 1-4.  Plaintiff's arguments are addressed after reviewing the history of the 2008 Rules.

1.        *DOL's 2008 Rules*

"In 2008, for the first time since the 1960s, the DOL promulgated a regulation governing the labor certification process through notice and comment rulemaking," *La. Forestry*, 745 F.3d at 662, and this new set of regulations for the H-2B visa program ignited a flurry of litigation.  In *Louisiana Forestry*, a group of plaintiffs challenged the 2008 Rules, arguing "that there exist[ed] no legal basis—statutory or otherwise—upon which the DOL may predicate its rulemaking concerning the H-2B program."  *Id.* at 669.  The Third Circuit disagreed, holding that "DOL ha[d] authority to promulgate rules concerning the temporary labor certification process in the context of the H-2B program."  *Id.*

Roughly a year after the Third Circuit affirmed the legality of the 2008 Rules, a district court judge in a different circuit reached a contrary conclusion.  In *Perez v. Perez*, the court acknowledged the Third Circuit's opinion in *Louisiana Forestry* but decided that "DOL lack[ed] authority to engage in legislative rulemaking under the H-2B program, and therefore lacked authority to enact the 2008 regulations."  No. 14-cv-682, 2015 U.S. Dist. LEXIS 27606, at *11 (N.D. Fla. Mar. 4, 2015).  The court then "vacated" the 2008 Rules and "permanently enjoined" DOL "from enforcing it," *id.* at *14, after April 30, 2015, *see* Order at 3, *Perez v. Perez*, No. 14-cv-682, ECF No. 49 (Apr. 30, 2015).

23

In the face of these conflicting judicial orders, DOL "ceased operating the H-2B program." *Outdoor Amusement*, 983 F.3d at 679 (quoting 80 Fed. Reg. 24151). "To restart the H-2B program, Homeland Security and Labor jointly promulgated" new rules in 2015 ("2015 Rules"). *Id.*; *see* Temporary Non-Agricultural Employment of H-2B Aliens in the United States, 80 Fed. Reg. 24042 (Apr. 29, 2015); Wage Methodology for the Temporary Non-Agricultural Employment H-2B Program, 80 Fed. Reg. 24146 (Apr. 29, 2015). The 2015 Rules were also challenged, but unlike the 2008 Rules, uniformly upheld. *Outdoor Amusement*, 983 F.3d at 679.

Five months after the *Perez* court's vacatur order, the plaintiff in *Perez* requested clarification that the "order 'permanently enjoin[ing]' Defendants from 'enforcing' [DOL's] [2008 Rules] was not intended to deprive DOL of its authority to enforce compliance with the substantive work terms contained in labor certifications issued pursuant to the 2008 [Rules] <u>prior to the entry</u> of the Court's permanent injunction." Pl.'s Unopposed Mot. to Clarify Perm. Inj. at 1, *Perez v. Perez*, No. 14-cv-682, ECF No. 58 (N.D. Fla. Aug. 28, 2015) (emphasis in original). Plaintiff sought the clarification because, after the vacatur order, DOL believed that the vacatur and injunction "may also prevent DOL from taking future action to enforce wage and other work terms contained in labor certifications approved prior to the entry of the injunction." *Id.* at 2. In seeking clarification, plaintiff reiterated that its complaint initiating the lawsuit only sought "to enjoin DOL from 'continued' use of the 2008 regulations to issue labor certifications; it was not filed to retroactively invalidate the few protections that those regulations provided." *Id.* at 2 (quoting Compl. at 2, *Perez v. Perez*, No. 14-cv-682, ECF No. 1 (N.D. Fla. Dec. 19, 2014)). Plaintiff described it as a "waste of judicial resources to force court[s] to rule on motions over the meaning of this Court's injunction when the simple clarification sought by Plaintiff would resolve the issue." *Id.* at 4. Thus, to avoid an outcome where the court's order would give

"employers *carte blanche* to mistreat U.S. and foreign workers," *id.* at 3, the plaintiff requested that the *Perez* court clarify that its order resulted "only" in DOL being "enjoined . . . from using the 2008 [Rules] to issue new labor certifications for H-2B workers and did <u>NOT</u> enjoin DOL from using its enforcement powers to ensure compliance with the terms and conditions of work promised in labor certifications approved prior to the effective date of the Court's injunction," *id.* at 4 (emphasis in original). The *Perez* court granted plaintiff's motion, clarifying in a single line order "that the permanent injunction was not intended to, and does not, apply retroactively." Order at 1, *Perez v. Perez*, No. 14-cv-682, ECF No. 62 (N.D. Fla. Sept. 4, 2015).

The *Perez* court had the opportunity in another case to reiterate that the clarification order only enjoined DOL from processing certifications under the 2008 Rules and did not bar DOL from enforcing the certifications that had been issued prior to the court's permanent injunction. Order at 6, *Drew's Lawn & Snow Service, Inc. v. Acosta,* No. 18-cv-979, ECF No. 14 (N.D. Fla. Feb. 11, 2019). In that case, the plaintiff was found by the Administrator to have committed violations of the H-2B visa program, stemming from a temporary labor certification issued under the 2008 Rules. *Id.* The plaintiff's motion to dismiss the action as barred by the *Perez* court's permanent injunction was denied in administrative proceedings and then revived when the plaintiff sued DOL, claiming the agency was in contempt of the *Perez* court's permanent injunction. *Id.* at 2. The court disagreed, holding that "based on the Court's clarification" in *Perez*, "the permanent injunction in *Perez* does not apply retroactively to prevent DOL from enforcing the conditions of labor certifications issued under the 2008 [Rules] prior to the entry of the injunction." *Id.* at 6.

2.        *Enforceability of the 2008 Rules*

Plaintiff makes the same plea rejected in *Drew's Lawn*: that the *Perez* court's initial order bars DOL's enforcement action in this case.  Pl.'s Mot. at 17-19, 25-29; Pl.'s Reply at 1-4.  This argument fails to grapple with the fact that plaintiff's interpretation of the court's remedy was "squarely rejected by the *Perez* court itself."  Defs.' Reply Supp. Cross. Mot. Sum. J. at 2, ECF No. 23.  Indeed, plaintiff nowhere cites to, mentions, or distinguishes the facts or circumstances of its case with *Drew's Lawn* despite the import of the holding that the *Perez* order did not preclude enforcement of labor certifications issued under the 2008 Rules prior to the permanent injunction's effective date.  Instead, plaintiff argues that the *Perez* order of vacatur "was necessarily retroactive."  Pl.'s Mot. at 22.  Yet, plaintiff cites no case law for the position that vacatur of the agency rules are *ipso facto* retroactive.  *See id.*  Indeed, whether vacatur of an agency rule is a prospective or retrospective remedy is an issue that is hotly debated.  *See* John Harrison, *Vacatur of Rules Under the Administrative Procedure Act*, 40 Yale J. on Reg. 119, 129 (2023) ("Vacatur is a prospective remedy, which eliminates the binding effect of regulations for the future."); Daniel H. Conrad, *Filling the Gap: The Retroactive Effect of Vacating Agency Regulations*, 29 Pace Univ. L. Rev. 1, 1 (2011) ("When a court vacates an agency regulation, there is a serious question as to whether or not the vacation should apply retroactively.").  Attempting to divine the intent or effect of the *Perez* court's order and whether the vacatur of the rule was retroactive or prospective, however, is unnecessary given the same court's clarifying order and subsequent decision in *Drew's Lawn* emphasizing that DOL had authority to enforce temporary labor certifications issued under the 2008 Rules and prior to the permanent injunction's effective date.  There is no question that plaintiff's temporary labor certification was issued under the 2008 Rules prior to the *Perez* court's permanent injunction.  AR 4078-83.

Accordingly, the *Perez* court's order does not infringe on DOL's authority to enforce the temporary labor certification plaintiff attested to under penalty of perjury almost a decade ago.[7]

### 3.   *The Effect of the 2015 Rules*

Nor does plaintiff's claim that the 2015 Rules repealed and replaced the 2008 Rules change the analysis here.  Pl.'s Mot. at 19-25.  Plaintiff's pages of argument on this point are difficult to follow, but seems to boil down to this: because the 2015 Rules repealed and replaced the 2008 rules, "enforcement actions based upon the 2008 [Rules] were doomed and the policy dice were cast."  Pl.'s Mot. at 24.  Given that the 2015 Rules make clear that they apply prospectively, *see* 29 C.F.R. § 503.1(d), plaintiff's position fails at the starting gate.  Plaintiff has provided no citation to pertinent or relevant legal authority supporting the proposition that a superseding regulation automatically renders a previous regulation retroactively unenforceable as to conduct occurring at the time the superseded rule was in force.  *See* Pl.'s Mot.; Pl.'s Reply.  The repeal and replacement of the 2008 Rules with new rules implemented with prospective effect does not obviate the legal element undergirding DOL's enforcement action against plaintiff—namely, that plaintiff willingly agreed to comply with 2008 Rules assuring DOL that

---

[7]        In a single sentence in its motion, not reiterated in its reply, plaintiff argues that if the *Perez* court's order did not render enforcement actions under the 2008 Rules void, "this Court should also vacate further enforcement of the 2008 DOL Rule" "[b]ecause Congress never mentioned, much less bestowed[,] rulemaking or adjudicative authority."  Pl.'s Mot. at 29; *see* Pl.'s Reply.  This may be an attempt to argue that, even if the 2008 Rules were not void, plaintiff should still be granted summary judgment on Counts 4 through 6, challenging the enforceability of the 2008 Rules.  For one, this "perfunctory and undeveloped argument[]," "unsupported by pertinent authority," is "waived."  *Sherrod v. McHugh*, 334 F. Supp. 3d 219, 265 (D.D.C. 2018) (quoting *Johnson v. Panetta*, 953 F. Supp. 2d 244, 250 (D.D.C. 2013)); *Schneider v. Kissinger*, 412 F.3d 190, 200 n.1 (D.C. Cir. 2005) ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones." (quoting *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990)).  For another, the Third Circuit's decision in *Louisiana Forestry*, holding that DOL "ha[d] authority to promulgate rules concerning the temporary labor certification process in the context of the H-2B program," is persuasive.  745 F.3d at 669.  The court determined, after an exhaustive analysis of the statutory and regulatory regime, *id.* at 669-80, that DOL's authority "derive[d] from regulation 214.2(h)(6)(iii), which was promulgated pursuant to the DHS's authority under sections 1101(a)(15)(H)(ii)(b) and 1184(c) of the INA to administer the nation's immigration laws, generally, and the H-2B program, specifically," *id.* at 669 (citing 6 U.S.C. §§ 202, 271(b); 8 U.S.C. § 1184(c)).  If plaintiff had not waived the issue by failing to present any argument or even a relevant legal citation, the Third Circuit's reasoning on this issue would have been adopted here.

temporary labor needs had been appropriately defined, so that DHS could evaluate whether to issue H-2B visas to bring noncitizen workers to the U.S., and that plaintiff failed to abide by its representations.  *See* AR 0361; 4075-4112.  Nothing in the 2015 Rules nor case law warrants a contrary conclusion.

***

In sum, the 2008 Rules are enforceable, and plaintiff's motion for summary judgment on Counts 4 through 6 is denied, and defendants' cross-motion is granted.

### D.    The Administrative Action Against Plaintiff was Timely.

Plaintiff next argues that DOL's enforcement action was barred by the five-year statute of limitations.  *See* Pl.'s Mot. at 29-38; Pl.'s Reply at 4-5.  This argument is based on plaintiff's reasoning that, because its H-2B violations were based on inaccurate information in its application, the agency was required to initiate proceedings within five years of when the application was filed or, alternatively, within five years of when the workers first arrived.  As support, plaintiff advances two different possibilities for when the statute-of-limitations clock started ticking: (1) when plaintiff submitted its application on November 7, 2012; or (2) when the workers first arrived on February 1, 2013.  Pl.'s Reply at 4-5.  Under either timeline, plaintiff maintains, DOL's action against plaintiff on February 6, 2018 was untimely.  Plaintiff's reasoning suffers fatal flaws.

The Board correctly concluded that DOL's enforcement action against plaintiff was not time-barred.  The ALJ, affirmed by the Board, determined that plaintiff substantially failed to comply with the job-classification requirement in 20 C.F.R. § 655.22(n) when it "employ[ed] H-2B workers in jobs not identified in the work order."  AR 0372; *see also* 8 U.S.C. § 1184(c)(14)(A).  Contrary to plaintiff's reasoning, this substantial failure to comply occurred not when plaintiff filed its temporary-worker application or when the workers first arrived, but

28

when the H-2B workers were actually misused for a period of almost three months—from February 1, 2013 to April 24, 2013. Said differently, a comparison between plaintiff's representations and plaintiff's actions, and a determination of whether any differences were substantial, were possible only *after* the employees' work expectations became apparent. Accordingly, as the Board determined, plaintiff did not "substantially fail[] to comply with the [job-classification] requirement . . . *until* it actually acted with reckless disregard of the H-2B program requirements by employing nine H-2B workers in job classifications other than [amusement and recreation attendants]." AR 4090. Under that timeline, DOL's enforcement action against plaintiff on February 6, 2018 falls within the five-year statute of limitations.

Plaintiff is also mistaken in asserting that a violation of 20 C.F.R. § 655.22(n), the regulation at issue here, cannot be based on a substantial failure to comply with the representations in its application. Plaintiff turns to the text of 20 C.F.R. § 655.22(n), which provides that "[t]he dates of temporary need, reason for temporary need, and number of positions being requested for labor certification [must be] truly and accurately stated on the application." In plaintiffs view, the regulation's reference to statements "on the application" limits violations exclusively to misrepresentations in the application itself, which plaintiff contends must necessarily occur at the time of the application's submission. Pl.'s Reply at 4. Plaintiff's interpretation is incorrect. Both statutory and regulatory authority plainly empower the agency to charge employers with either "*a substantial failure to meet any of the conditions* of the petition" or "a willful misrepresentation of a material fact in such petition." 8 U.S.C. § 1184(c)(14)(A) (emphasis added); *see also* 20 C.F.R. § 655.60 (providing that the Administrator shall determine whether an employer has, *inter alia*, "[f]iled a petition . . . that willfully misrepresents a material fact" or "*[s]ubstantially failed to meet any of*

29

*the conditions* of the labor certification application attested to" (emphasis added)).  Thus, plaintiff's motion for summary judgment on its claim that the administrative action was untimely (Count 7) is denied, and defendants' cross-motion is granted.

      **E.**    **DOL Articulated a Reasonable Explanation for Declining to Offset Plaintiff's Back Wage Liability.**

Finally, plaintiff contends that payments in back wages should be lowered because other benefits were provided to its employees, such as payment of their income taxes and various accommodations.  *See* Pl.'s Mot. at 43-46; Pl.'s Reply at 13-15.  In plaintiff's view, DOL acted arbitrarily and capriciously in declining to "offset" the amount in back wages owed by inadequately explaining the agency's reasoning and improperly shifting the burden of proof to the employer in requiring plaintiff to provide evidence in support of any claimed offsets.  Pl.'s Mot. at 44.  This contention is not persuasive.

In evaluating agency actions under the "arbitrary and capricious" standard, a court "must consider whether the [agency's] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."  *Marsh v. Ore. Natural Res. Council*, 490 U.S. 360, 378 (1989) (internal quotation marks omitted).  "[T]he scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency."  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 30 (1983).  Indeed, the arbitrary and capricious standard is "highly deferential" and "presumes the agency's action to be valid."  *Envtl. Def. Fund Inc. v. Costle*, 657 F.2d 275, 283 (D.C. Cir. 1981).  A court will not disturb an agency's determination if the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action[,] including a 'rational connection between the facts found and the choice made.'"  *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).

Here, ample reasoning supports the Review Board's conclusion that plaintiff "was not entitled to take any offsets for wages due" because it offered no credible evidence in support of those offsets.  AR 4109.  The Board acknowledged that, under the 2008 H-2B regulations, employers were permitted to make deductions from a worker's pay for the reasonable cost of furnishing, housing, and transportation, as well as worker expenses such as passport and visa fees.  AR 4108.  Yet, as the Board emphasized, "[t]he job offer must *specify* all deductions not required by law that the employer will make from the worker's paycheck."  AR 4108 (quoting 20 C.F.R. § 655.22(g)(1)).

As an initial matter, the Board, affirming the ALJ's determination, rejected plaintiff's proffer of a purported "joint statement" signed in 2019 by employees who worked for plaintiff in 2013.  The statement asserted that "employees received 'valuable benefits' such as housing, transportation, food, relocation, visa processing fees, 'and so on,'" for which plaintiff "would be entitled to receive a credit" to lower the back wages owed because "they were paying more than they had agreed to pay."  AR 3815.  The ALJ critiqued plaintiff's proffered statement for lacking "context for the circumstances in which it was signed."  AR 4108; *see also Acosta v. Austin Elec. Servs.*, 322 F. Supp. 3d 951, 958 (D. Ariz. 2018) (noting that context is important because "an employer is prohibited from obtaining, under coercive circumstances, employee declarations, particularly declarations that are relevant to and go to the heart of a pending claim that the employer failed to fully compensate employees").  The ALJ thus "did not give this statement any weight."  AR 4108.  Notably, plaintiff does not appear to dispute this finding on appeal.  Pl.'s Reply 14 (stating that "the 'joint' witness statement" is "not now relied upon").

Turning to plaintiff's other proffered evidence, the Board also approvingly summarized the ALJ's decision to give no weight to the job offer that plaintiff posted, which promised to

provide "mobile housing valued at $125.00 per week" and "transportation from venue to venue and scheduled transportation to laundry, [and] shopping valued at $25.00 per week."  AR 4109. As the ALJ reasonably explained, the job offer was ambiguous by not clearly stating whether the employer was deducting those benefits from the worker's pay (which could make the benefits eligible for offsets) or simply providing a free perk (which would not).  AR 4109.  Indeed, as the ALJ observed, plaintiff's claim that it was entitled to offset the cost of housing was "inconsisten[t]" with "employee statements in 2013" attesting that "housing was free."  AR 4108-09.  The ALJ similarly found ambiguity or inconsistency issues with other evidence that plaintiff proffered.  *See* AR 4108 (noting inconsistencies between the 2019 joint statement and the 2013 employee statements); AR 4109 (finding plaintiff's statement in its temporary employment certification application that it would "follow[] prevailing practices for Traveling Amusement Industry in regards to housing, transportation and weekly salary" to be "vague," as it failed to "clearly specify all, or any, of the deductions" that would be made).

Lastly, the Board endorsed the ALJ's determination that some of plaintiff's claimed offsets were "unreasonable."  AR 4109.  As the ALJ observed, "at least two" of the nine misclassified workers lived in semi-truck cabs, rather than in the trailers, and such a situation made plaintiff's "request [for] a deduction of $1,290 to $1,555 per employee" for sleeping in a semi-truck cab "unreasonable."  AR 4109.

Contrary to plaintiff's assertion, none of these findings inappropriately "foist[ed] the burden of proof" on plaintiff.  Pl.'s Mot. at 44.  Plaintiff's primary argument that certain expenses are eligible to offset back wage liability as a *general* matter fails to address the *specific* concerns raised by the ALJ and the Board here.  *See, e.g.*, Pl.'s Mot. at 43-44 (listing income tax, housing, and travel-related payments on behalf of the employees); *id.* at 44 (arguing that "the

2008 DOL Rule contains no general prohibition against wages or credits"); *id.* at 45 (explaining that "[t]he very purpose of taking these credits for benefits conferred is restitutionary"). While wage credits are generally permissible under certain circumstances, *see* Defs.' Opp'n at 29; AR 4109-10, the Board and the ALJ found that plaintiff's proffered evidence was too ambiguous or inconsistent—such as assertions about the prevailing practices of the industry (*see* Pl.'s Mot. 45)—or that its claimed offsets were too unreasonable, to support an award of credits in this case, AR 4108-09. *See, e.g.*, *Balbed v. Eden Park Guest House, LLC*, 881 F.3d 285, 290-91 (4th Cir. 2018) (employer must demonstrate, under the Fair Labor Standards Act, the reasonableness of credits towards wage obligations); *Donovan v. New Floridian Hotel, Inc.*, 676 F.2d 468, 473-74 (11th Cir. 1982) (same); *Donovan v. Williams Chem. Co., Inc.*, 682 F.2d 185, 190 (8th Cir. 1982) (same).

In short, the Board and the ALJ "reasonably considered the relevant issues" surrounding plaintiff's claimed offsets and "reasonably explained" their finding of ineligibility. *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). Plaintiff's motion for summary judgment on its claim that the agency acted arbitrarily and capriciously in denying offsets (Count 7) is denied, and defendants' cross-motion is granted.

## IV. CONCLUSION

For the foregoing reasons, plaintiff's motion for summary judgment is denied, and defendants' cross-motion for summary judgment is granted. An order consistent with this Memorandum Opinion will be entered contemporaneously.

Date: August 26, 2025

_____
**BERYL A. HOWELL**
United States District Judge